# United States District Court
## District of New Jersey

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL COMPLAINT |
| v. | : | |
| ALTARIQ GUMBS,<br>a/k/a "Killer Reek,"<br>a/k/a "Reek,"<br>a/k/a "Jersey,"<br>a/k/a "Sankofa" | :<br><br>:<br><br>: | Magistrate No. 10-7065 (ES) |

I, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief.

## SEE ATTACHMENT A

in violation of Title 21, United States Code, Section(s) 846.

I further state that I am a Special Agent for the Federal Bureau of Investigation and that this complaint is based on the following facts:

## SEE ATTACHMENT B

Brian K. McCaffery
Special Agent, FBI

Sworn to before me and subscribed in my presence,

April 16, 2010
Date

Newark, NJ
City and State

HON. ESTHER SALAS
United States Magistrate Judge

## ATTACHMENT A

From in or about November 2008 through in or about December 2008, in Newark, New Jersey and elsewhere within the District of New Jersey, defendant

ALTERIQ GUMBS,
a/k/a "Killer Reek,"
a/k/a "Reek,"
a/k/a "Jersey,"
a/k/a "Sankofa,"

did knowingly and intentionally conspire and agree with others to distribute and to possess with intent to distribute a quantity of heroin, a Schedule I controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), in violation of Title 21, United States Code, Section 846.

## ATTACHMENT B

I, Brian K. McCaffery, am a Special Agent with the Federal Bureau of Investigation ("FBI"). Based upon my investigation, a review of the case file and my discussions with other individuals involved in this investigation, I have knowledge of the following facts:

1. On or about October 15, 2008, a confidential informant ("CI") had a consensually recorded conversation[1] with ALTARIQ GUMBS, a/k/a "Killer Reek," a/k/a "Reek," a/k/a "Jersey," a/k/a "Sankofa" (hereinafter "GUMBS"), the leader, or Double Original Gangster ("OOG") of the Brick City Brims ("BCB"), a subset of the Fruit Town Brims ("FTB") set of the Bloods.

2. During this conversation, the CI and GUMBS discussed conducting a series of a heroin transactions, wherein the CI would receive heroin from R.C., a ranking member of the BCB, sell it and wire the proceeds so that GUMBS could pay off "debts." GUMBS instructed the CI that he wanted to send the proceeds to another inmate in the Arizona State Prison where GUMBS was incarcerated (hereinafter "Co-conspirator 1"). GUMBS ended the conversation by stating, "Brim up," a common FTB/BCB salutation.

3. On or about October 17, 2008, at approximately 12:10 p.m., the CI placed a consensually recorded conversation with R.C., and they arranged to meet. Shortly thereafter, the CI met with R.C. in Newark, New Jersey. This transaction was audio-recorded. R.C. provided the CI with two bricks[2] of heroin. The two bricks were tested by the Drug Enforcement Administration ("DEA") laboratory and have a net weight of 2.4 grams of heroin.

4. Shortly thereafter, the CI placed a consensually recorded conversation to GUMBS. GUMBS instructed the CI to send $450 via Western Union to an individual (hereinafter "Co-conspirator 2") in Phoenix, Arizona. GUMBS instructed the CI to call Co-conspirator 2 and provide him/her with the Western Union confirmation number.

5. On or about October 21, 2008, the CI sent approximately $100 via a United States Postal Service money order to Co-

---

[1] All conversations described herein are related in substance and in part. At the time of all of the conversations detailed herein, GUMBS was incarcerated in an Arizona state prison, where he was transferred by the New Jersey State Department of Corrections after numerous disciplinary violations, and GUMBS was utilizing an unauthorized cellular telephone.

[2] A "brick" consists of 50 "decks" of heroin. A deck is an individual package of heroin. A brick has a street value of approximately $500.

conspirator 1 in the Arizona State Prison where Gumbs was incarcerated and approximately $450 via Western Union wire transfer to Co-conspirator 2 in Arizona.

6. On or about November 13, 2008, the CI purchased 10 bricks of heroin from R.C. for $1800 in Newark, New Jersey. This transaction was audio and video recorded. The ten bricks were tested by the DEA laboratory and have a net weight of 13.3 grams of heroin.

7. On or about November 20, 2008, at approximately 4:31 p.m., the CI called GUMBS. This call was consensually recorded. During the call, the CI told GUMBS that he/she was unable to send GUMBS the proceeds from the sale of heroin that CI received from R.C. on or about November 13, 2008, due to problems with Western Union.

8. On or about November 21, 2008, the CI sent approximately $450 via a Western Union wire transfer to Co-conspirator 2 in Arizona.

9. Later that day, at approximately 4:48 p.m., GUMBS called the CI. This call was consensually recorded. During the call, the CI told GUMBS that he/she had send the money to GUMBS. GUMBS asked the CI for the MTCN[3] number. GUMBS and the CI also discussed another narcotics transaction, and GUMBS stated, "I'm gonna find somebody else [besides R.C.]. . . the prices may not be the same. . . is they gonna bring the shit down to 200, if it's over 200, they gonna bring it down to 200 'cuz I said so." Based upon my knowledge of the investigation, when GUMBS discussed "200," he was discussing the cost of heroin as being $200 per brick.

10. On or about November 24, 2008, the CI had a consensually recorded call with GUMBS. During this conversation, they discussed that GUMBS had lined up three additional heroin suppliers for the CI. Subsequently, GUMBS provided the CI with the phone number for B.J., a ranking BCB member.

11. On or about December 3, 2008, the CI had a series of consensually recorded conversations with B.J., in which B.J. agreed to sell the CI 10 bricks of heroin for $2,000.

12. On or about December 3, 2008, the CI met B.J. in Newark, New Jersey. This transaction was audio-recorded. During

---

[3] A "MTCN" number is the money transfer control number which is used by an individual on the receiving end of a wire transfer to pick up the transferred monies.

the transaction, B.J. told the CI that he needed to go get the heroin from his "cousin." The two drove to a different location in Newark, and the CI gave B.J. $2,000. B.J. and the CI had a discussion while waiting for the supplier of the heroin, during which B.J. detailed his narcotics connections, stating that he can get "RAW [heroin] for $160" and that he has a connection who "if I say I need 1000 bricks, he'll give me 1000 bricks." A short time later, B.J. got out of the car and met with another male ("Co-conspirator 3"), who gave B.J. the heroin. B.J. then provided the ten bricks of heroin to the CI. The ten bricks were tested by the DEA laboratory and have a net weight of 10.0 grams of heroin.